**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | TONY E. BUTTS | : | Chapter 7 |
| | STACEY Y. BUTTS | : | |
| | | : | |
| | Debtor(s) | : | Bky. No. 05-10104ELF |
| | | : | |

# O P I N I O N

**BY**: ERIC L. FRANK, United States Bankruptcy Judge

## I. INTRODUCTION

Before me is the Motion to Set Aside Judgment For Attorneys' Fees, filed by Northeastern Title Loans, Inc. ("NTL"). Attorneys' fees were awarded to the Debtors' counsel after the entry of a prior order holding NTL in contempt of court for violation of the automatic stay provision of the Bankruptcy Code, 11 U.S.C. §362(a). NTL alleges that it was not properly served in the matter and that the court orders should be set aside because they are void.

I will deny NTL's motion.

## II. PROCEDURAL HISTORY

On January 3, 2005, the Debtors commenced this case by filing a chapter 13 bankruptcy petition.[1] On January 12, 2005, the Debtors filed a Motion to Turn Over Property ("the Turnover Motion").

---

[1] The court may take judicial notice of the docket and the content of the bankruptcy schedules and other documents filed in the case for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute. See Fed. R. Evid. 201; In re Scholl, 1998 WL 546607, at *1 n. 1 (Bankr. E.D. Pa. Aug. 26, 1998). See also In re Indian Palm Associates, 61 F.3d 197, 205 (3d Cir. 1995).

-1-

In the Turnover Motion, the Debtors alleged that they had entered into a loan agreement with NTL, borrowing $2,515 at an interest rate of 365% per annum. The transaction was secured by the Debtors' automobile. The Debtors further alleged that:

- as of the commencement of the case, the automobile was in the possession of "Alliance," an agent of NTL;

- at the time the bankruptcy petition was filed, they gave notice to NTL and Alliance of the case by sending NTL letters dated January 3, 2005 and January 4, 2005, which were faxed and mailed to it by first class U.S. Mail;

- they offered to provide adequate protection of NTL's interest in the automobile through the purchase of collision insurance, providing for the replacement lien on the property, and cash payments in excess of any depreciation;

- in response to the Debtors, Alliance demanded payment of $1450.00 as the fee for impounding and storage of the automobile before it would turn over the automobile to the Debtors.

A hearing was held on the Turnover Motion on February 22, 2006. On that day, the court signed an order directing NTL to turn over the automobile to the Debtors forthwith and holding NTL in contempt of court.[2] No one appeared on behalf of either NTL or Alliance at the February 22, 2005 hearing. The docket also reflects that the Debtors' counsel was directed to submit an affidavit of attorney's fees to be acted upon the court without further hearing.

On February 26, 2005, the Debtors' counsel, Philip E. Horvitz ("Mr. Horvitz") filed an affidavit which identified the services he had provided in connection with the Turnover Motion. Mr. Horvitz requested an award of $1,120.00 in counsel fees based upon the expenditure of 6.4 hours at an hourly rate of $175.00. On March 7, 2005, the court entered an order awarding Mr. Horvitz the requested $1,120.00 in attorney's fees pursuant to 11 U.S.C. §105(a), "to be paid by

---

[2] The Order was entered by my predecessor on this court, the Hon. Kevin J. Carey, before his appointment to the United States Bankruptcy Court for the District of Delaware.

-2-

Defendants Northeast Title Loans and Alliance within thirty (30) days hereof."

On March 24, 2005, the court received a letter from a representative of Alliance on letterhead which set forth the name of the company as "Alliance Recovery Systems, LLC." The letter was docketed on March 30, 2005 as a "motion to reconsider order." After a hearing on April 19, 2005 and by order dated April 22, 2005, the court vacated the February 22, 2005 and March 7, 2005 orders to "eliminate [the] finding of contempt or awarding of attorneys' fees as to Alliance." The April 22, 2005 Order did not address NTL or its obligations under the prior court orders.

On September 14, 2005, the court entered an order confirming the Debtors' chapter 13 plan. On March 31, 2006, NTL filed a Motion to Set Aside Judgment For Attorney's Fees ("the Motion to Set Aside Judgment"). In the Motion to Set Aside Judgment, NTL asserted that it had not been served with the Turnover Motion. In the Motion to Set Aside Judgment, NTL asserts that service was not effected properly under "F.R.C.P. 4 and 5" and that in any event, it lacked actual notice of the Turnover Motion.[3] On April 10, 2006, the Debtors' counsel filed a response

---

[3] The Motion to Set Aside Judgment also speaks briefly to the merits of the Turnover Motion, stating that it "NEVER HAD POSSESSION either in fact nor constructively" of the Debtors' vehicle. NTL Motion to Set Aside Judgment ¶ 1 (emphasis in original). Given the evidence presented at trial, it is difficult to understand how NTL could make this allegation, much less "shouting out" the allegation as it did using all capitals in its written submission. The evidence presented by NTL's own witnesses during the hearing on the Motion to Set Aside Judgment was unequivocal and demonstrated that NTL advised Debtor Tony E. Butts in writing that it had repossessed his automobile, that the repossession was effected by NTL's agent and that NTL believed that it had the authority to direct its agent to release the repossessed vehicle. See Part III, Findings of Fact 3, 7, 10. I draw no legal conclusions from the disparity between NTL's written submissions to the court and the evidence presented in the evidentiary hearing. The merits of the court's order directing turnover of the vehicle and holding NTL in contempt is not before me. The only issue is whether NTL is entitled to relief from the order due to defective service of the Turnover Motion.

to the Motion to Set Aside Judgment, denying the material allegations.[4]

A hearing on the Motion to Set Aside Judgment was held on June 7, 2006. At the hearing, NTL presented the testimony of four (4) witnesses: John Henry, NTL's area manager responsible for the management of four (4) NTL business locations in Delaware; Valerie Henry, the manager of the NTL office located in New Castle, Delaware; Timothy Newell, NTL's Vice President for Field Operations; and Mr. Horvitz, counsel for the Debtors.

At the conclusion of the hearing, I requested that the parties submit memoranda to me. NTL's attorney stated that he wished to order the notes of testimony.[5] Based on the colloquy I had with the parties, I entered an order on June 9, 2006 which provided that NTL would file its memorandum 14 days after the notes of testimony were docketed and that the Debtors would file their memorandum 21 days after the filing and service of NTL's memorandum. The notes of testimony were docketed on July 12, 2006. Thus, NTL's memorandum was due on July 26, 2006.

On July 26, 2006, the due date of its Memorandum of Law, NTL filed what it styled a Motion to Set Aside Judgment for Attorney's Fees ("the July 26th Motion"). I find the filing of the July 26th Motion peculiar because NTL's prior Motion filed on March 31, 2006 was also called a Motion to Set Aside Judgment for Attorneys Fees. Attached to the July 26th Motion as an exhibit was a copy of the notes of testimony from the June 7, 2006 hearing. The July 26th

---

[4] In the response, the Debtors' counsel pointed out that while NTL asserted that it lacked notice of the motions filed in the bankruptcy case, NTL certainly had known about the case itself for some time, as it filed a proof of claim on May 25, 2005, more than seven (7) months before filing the Motion to Set Aside Judgment.

[5] Below, I will make reference to the notes of testimony of June 7, 2006 as "N.T."

-4-

Motion was also accompanied by a Memorandum of Law.  Significantly, the July 26th Motion was not accompanied by a Notice of Motion, Response Deadline and Hearing Date pursuant to L.B.R. 9014-3(h) and L.B.F. 9014-3.  Thus, it appears that NTL did not take any action to self-schedule the July 26th Motion for a hearing.  See L.B.R. 9014-3(c).  I also observe that the July 26th Motion contained the exact same prayer for relief as the prior Motion filed on March 31, 2006.  From all of these circumstances, I conclude NTL's purpose in filing its documents on July 26, 2006 was to comply with the June 9, 2006 scheduling order and I have reviewed all of the documents submitted by NTL before issuing this decision.

With the filing of NTL's Memorandum of Law on July 26, 2006, the Debtor's Memorandum of Law was due on August 16, 2006.  After an extension of time was granted to the Debtors, they filed their Memorandum of Law on September 7, 2006.

### III. FINDINGS OF FACT

Based upon my observation of the witnesses who testified at the June 7, 2006 hearing, the substance of their testimony and the exhibits offered into evidence, I make the following findings of fact:

1. On September 30, 2004, Debtor Tony E. Butts (individually, "Mr. Butts") entered into an installment loan and security agreement with NTL.

2. In the transaction between Mr. Butts and NTL, Mr. Butts borrowed $2,500.00 and financed a total of $2,515.00.  The loan was repayable in a single payment of $3,269.50 due on October 30, 2004.  The annual percentage rate in the transaction was 365%.  In the transaction, Mr. Butts gave NTL a security interest in his automobile.  (Exhibit B-1, Part 3).

Case 05-10104-elf    Doc 89    Filed 09/18/06    Entered 09/19/06 13:58:20    Desc Main
          Document      Page 6 of 20

3. On or prior to December 22, 2004, NTL repossessed the automobile owned by Mr. Butts. (Exhibit B-1, Part 1, 2).

4. The repossession was effected through Alliance Recovery Systems, LLC, a company hired by NTL and which acted as NTL's agent. (N.T. 59-60; Exhibit B-2).

5. On December 22, 2004, NTL mailed Mr. Butts a "Notice of Repossession." (Exhibit B-1, Part 1, 2). The Notice of Repossession advised Mr. Butts inter alia of:

- his "right to redeem" the vehicle;

- his right to retrieve his license plate and other items of personal property from the vehicle;

- the amount needed to redeem the vehicle; and

- NTL's intention to sell the vehicle by auction if not redeemed by January 5, 2005.

6. The Notice of Repossession also stated:

   Please address all correspondence to:

   NORTHEASTERN TITLE LOANS
   1560 NORTH DUPONT HIGHWAY
   NEW CASTLE, DE 19720

7. The fax number for NTL's office in New Castle Delaware is 302-326-2215. (N.T. 11, 30).

8. On January 3, 2005, the Debtors filed a chapter 13 bankruptcy petition in this court. (Docket Entry #1).

9. Upon the filing of a bankruptcy case, it is NTL's corporate policy to immediately release a repossessed automobile to the bankruptcy debtor without any conditions. (N.T. 55).

10. On January 3, 2005, Mr. Horvitz faxed a letter to NTL, to the attention of "Val," sent to NTL's correct fax number. In the letter, Mr. Horvitz gave NTL notice of the bankruptcy

filing, requested release of Mr. Butts' automobile and requested a copy of the "loan documents." The letter also was sent to NTL by first class mail. (Exhibit B-1).

11. NTL received Mr. Horvitz's January 3, 2005 faxed letter and, on the same day, faxed back to Mr. Horvitz a copy of the installment loan and security agreement between Mr. Butts and NTL. (Exhibit B-1, Part 3; N.T. 17-18).

12. Also on January 3, 2005, NTL's area manager, John Henry, issued a written Authorization to Release Vehicle ("the Authorization"). The Authorization was directed to "Alliance" and stated that Mr. Butts "has satisfied Northeastern Title Loans monetary requirements and may redeem his/her vehicle . . . ." The Authorization states in pre-printed form: "Additionally, Debtor is aware daily fees for storage, payable to you, may apply." Handwritten on the form is the statement:

     ✻**Debtor to pay storage!**
          **JH**

13. Due to the storage fees, Mr. Butts was unable to obtain immediate possession of his automobile. As a result, Mr. Horvitz spoke by telephone with Valerie Henry and John Henry on separate occasions. Both conversations were acrimonious. (N.T. 9-10, 27-28).

14. On January 12, 2005, the Debtors filed the Turnover Motion. (Docket Entry #5).

15. On January 12, 2005, Mr. Horvitz served NTL with: (a) the Turnover Motion and (b) Notice of the Turnover Motion, Response Deadline and Hearing Date by first class mail (collectively, "the Turnover Motion Documents") addressed to:

    Attention: Val
    NORTHEASTERN TITLE LOANS
    1560 NORTH DUPONT HIGHWAY

        NEW CASTLE, DE 19720

(Exhibit B-1, Part 5).

16. NTL's office in New Castle, Delaware generally receives mail that is properly addressed to it. (N.T. 35).

17. There are no corporate officers of NTL who maintain their offices in New Castle Delaware. (N.T. 28).

18. According to corporate policy, no individual who is employed in NTL's office in New Castle Delaware is authorized to receive legal process on behalf of NTL. (N.T. 9, 25, 47, 53).

19. According to corporate policy, when NTL's office in New Castle, Delaware receives notice of a bankruptcy filing, the Delaware office retrieves the subject loan file and forwards it to the NTL's corporate office in Atlanta, Georgia. (N.T. 9, 11, 30, 42, 53, 57).

20. According to office policy in the New Castle, Delaware office of NTL, upon receipt of legal documents, such as the Turnover Motion Documents, the office manager telephones the in-house corporate counsel in Atlanta, Georgia and faxes or mails the documents received to counsel (N.T. 36, 40, 55-56).

21. NTL received mail delivery of the Turnover Motion Documents in its New Castle, Delaware office.[6]

---

[6] I make this finding based, in part, on NTL's witnesses' admission that the New Castle, Delaware office generally receives its mail and the rebuttable presumption in the law that properly addressed mail is received by the addressee. E.g., Hegner v. United States, 285 U.S. 427, 430, 52 S.Ct. 417 (1932); In re Bodnar, 1998 WL 480856, at *7 (E.D. Pa. Aug. 13, 1998); In re Main, 157 B.R. 786 (Bankr. W.D. Pa. 1992). In addition, my finding is based on my assessment of the credibility of NTL's witnesses. See n.8, infra.

22. NTL staff in the New Castle, Delaware office forwarded the Turnover Motion Documents to NTL's legal department in Atlanta, Georgia in accordance with NTL corporate policy.[7]

23. On February 22, 2005, the court held a hearing on the Turnover Motion. No one appeared on behalf of either NTL or Alliance at the February 22, 2005 hearing. On that day, the court signed an order directing NTL to turn over the automobile to the Debtors forthwith and holding NTL in contempt of court. (Docket Entry #13, 14).

24. On February 25, 2005, Mr. Horvitz faxed a letter to NTL, to the attention of "Val", sent to NTL's correct fax number. In the letter, Mr. Horvitz referred to the court's order of February 22, 2005, requested that NTL "honor the Order of Court" and stated his intention to file a Motion for Sanctions if the automobile was not turned over within the week. The letter also was sent to NTL by first class mail at its New Castle, Delaware office as set forth on the Notice of Repossession. (Exhibit B-1, Part 6).

25. On February 28, 2005, Mr. Horvitz faxed a letter to NTL, this time to the attention of John Henry. The letter was faxed to NTL's correct fax number. In the letter, Mr. Horvitz requested turnover of the automobile by March 4, 2005 in order to avoid the filing of a Motion for Sanctions. The letter also was sent to NTL by first class mail at its New Castle, Delaware office as set forth on the Notice of Repossession. (Exhibit B-1, Part 7).

26. On March 7, 2005, Mr. Horvitz faxed another letter to NTL, again to the attention of John Henry. The letter was faxed to NTL's correct fax number. In the letter, Mr. Horvitz requested that NTL comply with the terms of the court's March 4, 2005 Order. The letter

---

[7] I make this finding as I have no reason to believe that company policy was not followed in this case.

also was sent to NTL by first class mail at its New Castle, Delaware office as set forth on the Notice of Repossession. (Exhibit B-1, Part 8).

27. NTL received the fax transmissions sent by Mr. Horvitz on February 25, 2005, February 28, 2005 and March 7, 2005.[8]

## IV. DISCUSSION

### A.

By filing the Turnover Motion on January 12, 2005, the Debtors invoked Fed. R. Bankr. P. 9013 and 9014. Rule 9013 provides that a request for an order, except when an application is authorized by the rules, shall be made by written motion. Rule 9014(b) provides that a motion

---

[8] I do not credit the testimony of John Henry and Valerie Henry that they never saw any of the faxes sent by Mr. Horvitz to the NTL office on February 25, 2005, February 28, 2005 and March 7, 2005. I find the testimony to be incredible in light of the fact that Mr. Horvitz used the correct fax number each time. I also find it significant that NTL promptly responded to Mr. Horvitz, the first time he faxed a letter to NTL back on January 3, 2005 (by immediately faxing back to Mr. Horvitz a copy of the underlying loan documents between NTL and the Debtors, as requested by Mr. Horvitz). The unbelievable testimony of these witnesses regarding the faxes of February 25, 2005, February 28, 2005 and March 7, 2005 causes me to mistrust the accuracy of the balance of their testimony, including their testimony that the Delaware office never received the Turnover Motion Documents, which were sent by first class mail. In addition, there was a relatively objective way to ascertain whether NTL received the Turnover Motion Documents. Had those documents been received in the New Castle, Delaware office, company policy dictated that they be forwarded to the legal department in Atlanta, Georgia. Although NTL went to the trouble of flying a corporate officer, Timothy Newell, from Atlanta to Philadelphia for the hearing in this court, Mr. Newell did not bring the file relating to the Debtors with him. He did not even take the trouble of reviewing the file before coming to court. If corporate policy had been followed in this case, the bankruptcy related documents sent to the Delaware office by Mr. Horvitz would have been forwarded to NTL's Atlanta office. Therefore, an examination of the Atlanta file may have revealed whether NTL's Atlanta office ever received the Turnover Motion Documents from its local management in Delaware. From NTL's apparent failure to undertake this most simple investigation, I draw the inference that a review of the file in Atlanta would have revealed evidence contrary to NTL's position. See In re Hammeken, 316 B.R. 723 (Bankr. D. Ariz. 2004); In re Osborne, 257 B.R. 14 (Bankr. C.D. Cal. 2000). See also United States v. Knox, 68 F.3d 990 (7th Cir. 1995).

"shall be served in the manner provided for service of a summons and complaint by Rule 7004."
Rule 7004(b)(3) provides that service may be made within the United States by first class mail postage prepaid:

> Upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.

In this case, the Debtors served the Turnover Motion by mailing it, along with Notice of the Motion, to NTL at its business address in New Castle Delaware. The mailing was marked to the attention of "Val," the individual who, as it turned out, was the manager of NTL's New Castle, Delaware office.

NTL asserts that the judgment should be set aside as void because service was invalid. In particular, NTL argues that by mailing the Turnover Motion Documents to a local office of NTL, to the attention of "Val," the Debtors failed to serve an officer or an agent who was authorized to receive service of process. NTL also argues that the defective service renders void the court's order of February 22, 2005. NTL's Pre-Trial Memorandum of Law at 3-4.[9]

To be sure, there is legal authority which supports the proposition that the requirements of the rule authorizing nationwide service of process by first class mail on corporations should be strictly enforced. E.g., In re Schoon, 153 B.R. 48, 49 (Bankr. N.D. Cal. 1993) (requiring "literal compliance" with the rule). Compare In re Sun Healthcare Group, Inc., 2004 WL 941190, at *2

---

[9] In making this argument, NTL states that the New Castle, Delaware office location "is not the corporation's correct address." NTL's Pre-Trial Memorandum at 4. Rather, NTL says that the correct address is set forth in its proof of claim filed on April 25, 2005: 3440 Preston Ridge Road, Alpharetta, GA 30005. Of course, the proof of claim was filed more than three months after the Turnover Motion.

(Bankr. D. Del., Apr. 30, 2004) (same); with In re Lenox Healthcare, Inc., 319 B.R. 819, 821-22 (Bankr. D. Del. 2005) (observing that courts have required "strict compliance" with Rule 7004(b)(3), but also observing that "[c]ourts vary on the specificity required"). Further, failure to comply with the requirements of Rule 4 may render a default judgment void. See In re Sun Healthcare Group, Inc., 2004 WL 941190, at *3 (declining to consider diligence of defendant in asserting motion under Rule 60(b)(4) and Fed. R. Bankr. P. 9024).

Other courts have viewed Rule 4 through a different prism, seeing it as "a flexible rule that should be liberally construed so long as a party received sufficient notice of the complaint." Wilen I.Y.M., L.C. v. Colter & Peterson, 1998 WL 1093900, at *2 (D.N.J. 1998) (quoting Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc., 840 F.2d 685, 688 (9th Cir. 1988)). See also Stranahan Gear Company, Inc. v. NL Industries, Inc., 800 F.2d 53, 56 (3d Cir. 1986) ("[w]hen there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process").

I find it unnecessary to use any broad presumptions as the basis for ruling in this case. Rather, I conclude that the appropriate rules of decision may be derived from the purpose and text of the Rule 7004(b)(3), as well as the construction accorded to the rule by courts in this district.[10]

---

[10] I also observe that the "narrow construction" cases under Rule 4 tend to involve mail service on a corporation, either sent to a post office box without reference to any corporate officer, e.g., In re Lenox Healthcare, Inc., or a mailing addressed with a reference to a generic corporate title, e.g., In re Schoon. In this case, by comparison, Mr. Horvitz attempted to make service by sending process to a specific individual, Valerie Henry, with whom he had spoken by telephone. Thus, as explained in the text below, the issues in this case are whether Ms. Henry was an appropriate individual to receive service and whether she received the papers. Cf. In re Golden Books Family Entertainment, Inc., 269 B.R. 300 (D. Del. 2001) (service found improper because the movant did not mail the documents to any specific individual even though the

The purpose of the rule has been summarized as follows:

> The fundamental purpose for requiring proper service of process is to ensure that the defendant is both placed on notice of the commencement of the legal action and afforded an opportunity to present his objections. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); Tarbox v. Walters, 192 F.Supp. 816, 817 (E.D. Pa. 1961); Sechrist v. Palshook, 97 F.Supp. 505, 507 (M.D. Pa.1951). The notice provided by the service of process must be reasonably calculated to convey the required information and must afford the defendant a reasonable period of time in which to make an appearance. Mullane, 339 U.S. at 134. In the context of serving a corporation, service is proper if made on an individual whom one could reasonably expect will forward notice of the pending lawsuit to his corporate superiors. Alloway v. Wain-Roy Corp., 52 F.R.D. 203, 204 (E.D. Pa. 1971). The burden of demonstrating proper service of process lies on the plaintiff/server. Gottlieb v. Sandia American Corp., 452 F.2d 510, 513 (3d Cir.), cert. denied, 404 U.S. 938 (1971).

Baldwin v. Celotex Corp., 1986 WL 13299, *1 (E.D. Pa. Nov. 17, 1986).

Rule 7004(b)(3) refers to service on a "managing or general agent" as well as an "other agent authorized by appointment or by law to receive service of process." In its pre-trial submission and at trial, NTL placed great emphasis on the fact that as a matter of corporate policy, no employee in the Delaware office was authorized to accept service of legal process. However, the rule is written in the disjunctive, suggesting that a "managing or general agent" may be served in compliance with the rule and that such a person may be distinct from an "other agent authorized by appointment or by law to receive service of process." As the court observed in Wilen I.Y.M., L.C.:

> [Rule 4] does not require that service be made solely on a restricted class of formally titled officials, but rather permits it to be made "upon a representative so integrated with the organization that he will know what to do with the papers. Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service."

1998 WL 1093900, at *2 (quoting Top Form Mills, Inc. v. Sociedad Nationale Industria

---

respondent's responsible party was well known to the movant).

Applicazioni Viscosa, 428 F.Supp. 1237, 1251 (S.D.N.Y. 1977).

As suggested by the court in Wilen I.Y.M., L.C., the meaning of the term is based on a functional analysis of the operation of the defendant corporation and the role played by the individual who actually received delivery of process. It is not determined by abstract or formalistic corporate policy. Therefore, for purposes of the case at bench, the critical term in Rule 7004(b)(3) is "managing or general agent" and the issue is whether the Debtors' service of the Turnover Motion Documents on Valerie Henry, the manager of NTL's New Castle, Delaware office, constituted service on a general or managing agent.

The test for evaluating whether an individual is a "managing or general agent" was concisely summarized by a district judge in this district as follows:

> In order to qualify as a "managing or general agent," the individual should be "a responsible party in charge of any substantial phase of the corporation's operations." That person should perform duties which are sufficiently necessary to the corporation's operations and occupy a position of sufficient responsibility so that it is reasonable to assume the individual will forward the summons and complaint to organizational superiors.

Hartsoe v. KMart Retail Distribution Center, 2000 WL 21263, *2 (E.D. Pa. Jan.13, 2000) (per Broderick, J.) (quoting Gottlieb v. Sandia American Corp., 452 F.2d 510, 513 (3d Cir.), cert. denied sub. nom., Wechlser v. Gottlieb, 404 U.S. 938, 92 S.Ct. 274 (1971)) (other citations omitted); accord, Wilen I.Y.M., L.C., 1998 WL 1093900, at *2 (the rule permits service "upon a representative so integrated with the organization that he will know what to do with the papers"). The ultimate question is "whether the individual's role in the organization made service on the individual fair and reasonable." Meoli v. Message Center USA, 1998 WL 717418, at *1 (E.D. Pa. Sept. 25, 1998) (per Kauffman, J.).

Based on the record in this case,[11] I am satisfied that Valerie Henry was of sufficient stature and held sufficient responsibility within NTL to merit her designation as a "managing or general agent" for purposes of Rule 7004(b)(3). Ms. Henry held the title of "manager" of NTL's field office in New Castle, Delaware. She had significant responsibilities in that she was responsible for the work of 10 customer service representatives. N.T. 27. She had substantial involvement in cases in which a bankruptcy has been filed by an NTL customer and, in particular, when a request for release of a repossessed automobile has been made by a bankruptcy debtor. See N.T. 42, line 24 to N.T. 43, line 8 (testimony suggesting that the other customer service representatives regularly directed requests for release of automobiles to her attention). In fact, Ms. Henry spoke with Mr. Horvitz about the dispute arising from the apparent obstacles Mr. Horvitz encountered in effecting the release of Mr. Butts' automobile after notice of the bankruptcy filing had been provided to NTL. Consequently, I infer that Mr. Horvitz had a reasonable basis to believe that Ms. Henry had decision making authority with respect to the dispute giving rise to the contested matter in this case. At a minimum, Mr. Horvitz had a reasonable basis to believe that Ms. Henry had "at least such status that common sense would expect her to see that the summons [would get] promptly into the hands of the right corporate people." Wilen I.Y.M., L.C., 1998 WL 1093900, at *2. Most significantly, whether or not Mr. Horvitz was subjectively aware of Ms. Henry's precise role in the company, his instincts in directing the Turnover Motion Documents to her attention led him to serve an appropriate corporate representative. Ms. Henry completely understood her responsibilities with respect to

---

[11] Once the adequacy of service is questioned, the party who made service has the burden of establishing the validity of service. Hartsoe v. KMart Retail Distribution Center, 2000 WL 21263, at *2. For the reasons discussed above, I conclude that the Debtors have met that burden.

Document      Page 16 of 20

documents received in connection with this legal dispute. She understood that she had the responsibility to forward to NTL's corporate counsel papers relating to bankruptcy generally and court papers in particular. N.T. 33, 35.

The peculiarity in this case is that Ms. Henry denies ever seeing the Turnover Motion Documents. However, she also denies ever seeing the fax Mr. Horvitz sent to her attention on February 25, 2005. Her husband, John Henry, denies ever seeing the faxes sent to his attention on February 28, 2005 and March 7, 2005. All of these faxes were sent to the correct fax telephone number and alerted NTL to the fact that court orders had been entered in the bankruptcy case. I find it impossible to believe that not one of these communications was received. See n.8, supra.

Therefore, for the reasons set forth above, I conclude service of the Turnover Motion on Valerie Henry, the manager of NTL's New Castle, Delaware office satisfied the requirements of Fed. R. Bankr. P. 7004(b)(3). Since service of the motion was valid, NTL's argument that the court's order of February 22, 2006 was void must fail.

I have also found, based on the evidence presented, that NTL actually received the motion. Pursuant to Fed. R. Civ. P. 60(b)(1), incorporated by Fed. R. Bankr. P. 9024, a court may set aside an order based on "mistake, inadvertence, surprise, or excusable neglect." Rule 60(b)(6) authorizes relief for "any other reason justifying relief from the operation of the judgment." In some cases, after proper service has been effected, relief from an order may be appropriate if a party comes forward with some type of reasonable excuse or its failure to act was due to some type of honest mistake. See 10A C. Wright & A. Miller, Federal Practice & Procedure 3d §2695 (2006).

NTL has neither invoked Rule 60(b) nor come forward with any explanation why it did not respond to the Turnover Motion (other than its assertions, which I have rejected, that it was not properly and actually served). Rather, for reasons which it has not chosen to explain, NTL's legal strategy has been to challenge the technical sufficiency of service. I have rejected NTL's factual assertions and legal arguments. Consequently, I will deny the Motion to Set Aside Judgment insofar as it challenges the validity of the February 22, 2005 order.

**B.**

In its post-trial Memorandum of Law, NTL raises an issue that was not emphasized in its March 31, 2006 Motion or during the trial of this matter.

NTL suggests that separate and apart from the validity of the entry of the February 22, 2006 Order, the entry of the March 7, 2005 Order awarding Mr. Horvitz fees was without notice to NTL and denied NTL due process of law. As NTL conceptualizes it, the court denied Mr. Horvitz' request for counsel fees on February 22, 2006, thus requiring that any request for fees be requested by motion after notice and hearing. NTL argues that Mr. Horvitz requested and obtained an "ex parte order." NTL does correctly observe that the docket does not show that Mr. Horvitz served NTL with the "Affidavit of Time Expended to Prepare and Present the Motion to Turn over Property Pursuant to 11 U.S.C. §542" which he filed on February 26, 2005.

I find NTL's argument mischaracterizes the court's decision on February 22, 2006 and is therefore, without merit .

As a starting point, there is no dispute that the Turnover Motion requested an award of counsel fees in the prayer for relief. Since I find that NTL was properly served with the Turnover

Motion, NTL was on notice that the Debtors were seeking an award of counsel fees. While it is true that Judge Carey deleted the language in the Debtors' proposed order awarding fees, it is disingenuous for NTL to interpret that action as a denial of the request. Judge Carey specifically made a separate entry on the docket which stated *"Affidavit of Attorney Fees tbs. Ct. to act without further hearing."* This docket entry expresses the court's intent to award counsel fees. I infer that Judge Carey deferred that decision until receipt of additional detail, in written form, of the services rendered by Mr. Horvitz and the amount of time expended.

In short, an award of counsel fees could have been made on February 22, 2006 without violation of NTL's due process rights. NTL was on notice of the hearing and did not attend. The court's request for a written submission in order to liquidate the amount of counsel fees that it had determined to award did not require the filing of a separate motion. See Fed. R. Bankr. P. 7054 (incorporated by reference by Fed. R. Bankr. P. 9014) (award of attorneys' fees shall be by motion "unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial").[12]

---

[12] In this case, the Debtors requested an order holding NTL in contempt for violation of the automatic stay which resulted in the court hearing on February 22, 2006. In a number of reported decisions in which debtors have filed similarly styled motions, courts have invoked 11 U.S.C. §362(k) and stated that the remedy for a willful violation of the automatic stay may include monetary damages, attorneys' fees, costs and punitive damages. E.g., In re Alvarez, 319 B.R. 108, 111 (Bankr. W.D. Pa. 2004); In re Bowen, Bowen 2000 WL 708961, *5 (Bankr. E.D. Pa.. May 26, 2000). See generally In re Atlantic Business & Community Corp., 901 F.2d 325 (3d Cir. 1990). Section 362(k) expressly provides that attorney's fees are included in the "actual damages" which are compensable for a willful violation of the automatic stay. Therefore, I conclude that attorneys' fees are "an element of damages to be proved at trial" within the meaning of Fed. R. Bankr. P. 7054 when a party seeks to remedy a violation of the automatic stay. As such, there was no requirement that a separate motion be filed in this case. As I conceptualize the events, Judge Carey simply allowed the record made on February 22, 2006 to be supplemented by the submission of another document before issuing his ruling.

An order consistent with this Opinion will be entered.

Date:   September 18, 2006                   _____
                                             ERIC L. FRANK
                                             U.S. BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | **TONY BUTTS** | : | Chapter 7 |
| | **STACEY BUTTS** | : | |
| | | : | |
| | **Debtor(s)** | : | Bky. No. 05-10104ELF |
| | | : | |

**O R D E R**

**AND NOW,** it is hereby **ORDERED** that the Opinion dated September 18, 2006 shall replace the Opinion issued by the Court on September 12, 2006 to correct references therein to a footnote on pages 8 and 16.

It is further **ORDERED** that the Order dated September 12, 2006, that was issued with the Opinion dated September 12, 2006, remains in effect.

Date:   September 18, 2006

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE